UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

EDWIN GRANT,

                    Petitioner-Defendant,

    -against-

STEVEN RACETTE, Superintendent,
Clinton Correctional Facility,

                  Respondent.
--------------------------------------------------------X

**REPORT AND RECOMMENDATION**

14-CV-3446 (DLI) (ST)

**TISCIONE, United States Magistrate Judge:**

      Petitioner Edwin Grant seeks a writ of habeas corpus. *See* 28 U.S.C. § 2254(d). For the reasons discussed below, it should be denied.

      Petitioner is currently serving a 55-year prison sentence, imposed on February 27, 2008, for attempted murder, attempted robbery in the first degree, aggravated assault upon a police officer, and criminal possession of a weapon in the second degree.

      Petitioner raises constitutional challenges to three alleged errors at trial upheld by the appellate court: (1) improper admission of an in-court identification; (2) the exclusion of an expert and a fact witness; and (3) ineffective assistance of counsel based on trial counsel's failure to object to the exclusion of Mr. Grant's expert and fact witnesses.

      As discussed below, each of Petitioner's claims fails.

**BACKGROUND**

**I.    Crime of Conviction and Police Investigation**

      On May 10, 2006, at approximately 2:15 p.m., Larry Young, an off-duty detective, was standing in front of his house, on Carroll Street in Crown Heights, Brooklyn. *See* Trial Tr., ECF

No. 8-5 – 8-16; Young: 109, 119-20, 122-25.[1] Young was talking to a friend, Thomas Swann, while another friend, Crystal Rodriguez, a cable installer, worked in and around her van, which was double parked in front of Young's house. Rodriguez: 60-68, 79, 94, 96-98, 100; Young: 121-27; Brown: 359-61; Swann: 371, 374-75, 407, 414. There was a construction site across the street. Rodriguez: 64-65; Young: 126, 141.

Young noticed two men walk down Carroll Street from Utica Avenue and stop in front of a house that was adjacent to the construction site. Rodriguez: 66-67; Young: 127-32, 138, 142-43, 196-99; Swann: 376-77, 415-17. Young had lived on the block for forty-three years, and knew that the men were not from the neighborhood. Young: 119, 126-29, 200, 218. Young had an unobstructed view of the men for five to fifteen minutes, as he talked with Swann and as Rodriguez worked inside the van. Rodriguez: 68, 98, 100, 104; Young: 112-16, 128-31, 138-43, 192-93, 195-202, 206-07, 230, 274-75; Swann: 377-78, 416-17. The men did not talk to each other, but kept looking up and down the street. Young: 139-40, 197. Young then told Rodriguez and Swann to get in the house because he believed the situation was suspicious. Rodriguez: 68-70, 98-99, 103; Swann: 378, 417-19.

Dennis Moore was the owner of a construction company that was operating at the construction site opposite Young's house. Moore: 41-42. Moore employed eleven people at the site, and May 10, 2006 was payday. Moore: 43-45. Moore had withdrawn approximately $10,000.00 in cash from the bank and had placed the money in his jacket pocket. Moore: 45-46. Moore drove up to the construction site in a van. Moore: 47; Young: 141, 143, 197, 209-10; Swann: 378. As Moore exited the van and stepped onto the sidewalk, the two men Young had been

---

[1] The trial transcript is included as Exhibit C of Respondent's Response to the Court's Order to Show Cause and is divided into multiple attachments. *See* ECF Nos. 8-5 – 8-16. The numbers cited herein refer to the applicable pages of the trial transcript, and the names preceding the page numbers refer to the witnesses who testified to the cited facts.

watching drew handguns, approached Moore and ordered him to "take it off," which Moore construed as a demand to remove his jacket. Moore: 47-48; Rodriguez: 69; Young: 143-45, 194, 197, 210, 212, 220, 225; Swann: 378, 418. When Moore did not remove the jacket, the two men pistol-whipped him and shot him three times. Moore: 48-50; Rodriguez: 69-70; Young: 143-45, 194, 210, 220, 225; Swann: 378, 380-81, 418; Doctor Robert Kurtz: 834-44.

Young took out his badge and his gun. Rodriguez: 76-77; Young: 144-47, 225; Swann: 380, 419-20. He advanced across the street, identified himself as an off-duty police officer, and ordered the men to stop. Rodriguez: 71, 76-77; Young: 144-47, 210-12, 216, 225; Brown: 364, 366-67; Swann: 382, 418, 420. The men shot at Young, and Young returned fire. Rodriguez: 77, 101; Young: 147-49, 161, 194, 211-17, 219-20, 225-26; Swann: 382-84, 420-21, 424-25. Young was not hit, but he thought he had hit one or both of the perpetrators. Young: 213, 215, 226; Swann: 421. The men fled down Carroll Street toward Ford Street, got into a burgundy Maxima with tinted windows, custom rims, and out-of-state license plates, and drove away. Rodriguez: 100; Young: 149-50, 159-62, 226-28, 232; Swann: 384; Frances Waldrop: 466-70, 472, 475-76. Before entering the car, one of the men said that he was hit. Waldrop: 467-68. That man got into the front passenger seat; the other man got into the rear passenger seat. Waldrop: 467-68, 470-72.

At approximately 2:30 P.M., Petitioner walked into Kings County Hospital with a gunshot wound to the leg and was taken to the emergency room. Colleen Boston: 339-45, 349. Detective Charles Arnao was assigned to interview the gunshot victim at Kings County Hospital. Arnao: 557-60. Detective Arnao knew that there had been a shooting on Carroll Street, but did not know that Petitioner had been involved in that shooting. Arnao: 557-58, 568. Detective Arnao identified himself to Petitioner and asked him what happened. Arnao: 565-66. Petitioner said he was at his friend Richie's house. Arnao: 566. Detective Arnao inquired as to Richie's last name. Arnao: 566.

Petitioner said he did not know. Arnao: 566-67. Detective Arnao asked for Richie's address. Arnao: 566-67, 583. Petitioner again said he did not know. Arnao: 566-67, 583.

When asked how he had been shot, Petitioner said he was in the area of Avenue J and Remsen Avenue, when he saw a group of males wearing blue bandanas. Arnao: 566-67, 582-83. Petitioner said he heard a gunshot and felt a burning sensation in his leg. Arnao: 566-67, 582-83. Petitioner also said that if Detective Arnao went to the location, he would find a shell casing on the ground. Arnao: 566-68, 580. Detective Arnao asked Petitioner what type of gun it was. Arnao: 566. Petitioner did not answer the question; instead, Petitioner said he was tired, turned his head, and closed his eyes. Arnao: 566-68, 587-88. Detective Arnao did not ask Petitioner any other questions and left the room. Arnao: 568, 572, 587-88. (Subsequently, Sergeant Juan Duque investigated Petitioner's claim that he had been shot on May 10, 2006 in the area of Avenue J and Remsen Avenue, but was not able to substantiate the claim. Duque: 594-99, 602-06, 608-11.)

Detective Michael Routledge was notified of the shooting at 2:25 p.m., and arrived at the crime scene approximately five minutes later. Routledge: 486-87. Detective Routledge saw medical personnel load Moore in the ambulance and take Moore to Kings County Hospital. Moore: 52; Routledge: 488. Detective Routledge interviewed a number of witnesses, including Detective Young. Routledge: 488-89, 518-19. Detective Routledge was then notified that a male fitting the description of one of the perpetrators had just walked into Kings County Hospital with a gunshot wound. Routledge: 491-92, 542.

Detective Routledge drove Young to Kings County Hospital for a show-up. Young: 162-65, 240-41, 246-49, 334-36; Routledge: 492-94, 517, 529. At the hospital, Detective Routledge arranged a show-up in which Moore and Detective Young viewed Petitioner. Moore: 52-53; Routledge: 497-500, 525, 528, 533-34. Moore said that he was 60-65 percent sure that Petitioner

was one of the men who had attacked him. Moore: 53-55. Detective Young said that he was 100 percent sure that Petitioner was one of the men with whom he had exchanged fire. Young: 164-71, 249-60; Routledge: 529.

Detective Routledge placed Petitioner under arrest and learned Petitioner's home address. Routledge: 505. Detectives went to Petitioner's house and located the burgundy Maxima, which was owned by Petitioner's mother. Trial Tr. at 38-39 (Stipulation); Routledge: 506; Detective Richard Lyman: 625-27. There were what appeared to be blood stains on the front passenger seat. Routledge: 506-08; Lyman: 627-28. A few months prior to the shooting, Police Officer Tancredi had approached Petitioner in the car because of loud music that was coming from the car, at which point Petitioner identified himself as the car's owner. Tancredi: 734-36. The police obtained a warrant to search the vehicle. Routledge: 508. Detective John Entenmann found blood on the front passenger seat, on the center console, and in the passenger well area of the front seat. Entenmann: 697-98, 702-03. Detective Entenmann photographed the blood stains, swabbed the area, and forwarded the swabs to the medical examiner's office. Entenmann: 698-700, 702-05, 724-25. Forensic experts determined that the DNA of the blood on the front passenger's seat matched Petitioner's DNA, with odds that the blood was not Petitioner's estimated at one trillion to one. Detective Daniel McClean: 632-36, 640; Asako Ishii: 980-81, 1002-21.

Police also took possession of Petitioner's clothing as he entered the hospital. Detective Anthony D'Amato: 1030-38, 1049-50; Officer Richard Silverstein: 1083-84, 1090-91. They observed blood on Petitioner's T-shirt and jeans, possible bullet holes in each item, and a .45 caliber shell casing. Silverstein: 1103-07, 1114; D'Amato: 1034, 1049-50, 1053-55, 1065. A forensic analyst later observed lead residue, consistent with bullet holes, in the holes in Petitioner's clothing. Carol Myers: 936-51. Police also collected thirteen bullet casings from the crime scene,

including six .45 caliber shell casings, which a ballistics analyst determined all came from the same gun, as well as seven nine millimeter shell casings, six of which came from a standard police-issued firearm and the remaining of which came from a third, unknown firearm. Detective David Rivera: 886-97, 902-13; Detective James Valenti: 798-826.

The jury found Petitioner guilty of attempted murder, attempted robbery in the first degree, aggravated assault upon a police officer, and criminal possession of a weapon in the second degree, and judgment was entered against him on February 27, 2008. *See People v. Grant*, 942 N.Y.S.2d 223, 223 (2d Dep't 2012).

## II.    State Court Procedural History

Of the events at pre-trial hearings and at trial, three are relevant to the Petitioner's claims here: (i) the trial court's admission of the in-court identification of Petitioner by Thomas Swann, who previously failed to identify Petitioner at a police line-up; (ii) the exclusion of an expert witness on eyewitness identification proposed by the defense; and (iii) the exclusion of the testimony of Delon Duncan.

### i.    Admission of Swann's In-Court Identification

Thomas Swann, who had been with Detective Young at the site of the shooting, testified that there were two perpetrators: one with dark skin and one with light skin. Swann: 377. Swann stated that he had a back- and side-view of the light-skinned perpetrator, and that he had a better view of the dark-skinned perpetrator. Swann: 381-82, 391. There was a three-foot high dumpster between Swann and the perpetrators, and he could only see them from the waist up. Swann: 381.

Despite being present at the scene of the crime, Swann failed to identify Petitioner at a police line-up. Trial Tr. at 441 (Stipulation); Swann: 387-92, 427, 431-38, 446-51. Swann was initially unable to decide which of two men in the line-up was the perpetrator; in fact, neither of

the men that Swann initially suspected was Petitioner. Swann: 388-89. Swann explained that making an identification at the line-up was difficult because the men had hats on and were sitting down, and he could therefore not get a good look at them. Swann: 389-390.

Nonetheless, Swann stated that based on his view of the perpetrator at the scene, he estimated that the perpetrator was roughly 5'9" or 5'10", had a medium frame, was about 23-24 years old, and had wielded a black gun that looked like a nine-millimeter. Swann: 394-395. The prosecutor, over defense counsel's objection, asked Swann if anyone in the courtroom had the same skin complexion as the light-skinned perpetrator; Swann replied that Petitioner "looks like him." Swann: 384-85.

After Swann made this identification, defense counsel objected, arguing that Swann's inability to identify Petitioner at the line-up should have precluded his in-court identification of Petitioner. Trial Tr. at 392-93. The Court overruled the objection, stating, "There is nothing improper about the district attorney bringing out the fact that the defendant on trial has the same complexion and stature of the individual he observed on the scene and he has absolutely every right to try to explain to this jury why the witness was unable to make an identification during a line-up." *Id.* at 393.

ii.    *Exclusion of Defense's Proposed Expert Witness on Eyewitness Identification*

Defense counsel made an application prior to trial to introduce expert testimony concerning the reliability of eyewitness identifications. Jury Selection ("JS") Tr., ECF No. 8-3 at 38-39. Defense counsel proffered that the expert would testify about the effect of stress, violence, and weapon focus on eyewitness identifications and on the pressures police officers feel, as law enforcement professionals, to make identifications. *Id.* at 44-45. The prosecutor opposed the

application on the ground that this was not a case in which the state was relying on eyewitness testimony alone, noting that there was DNA evidence linking Petitioner to the crime. *Id.* at 39-41.

The court initially ruled that the defense would not be allowed to introduce expert testimony concerning the reliability of eyewitness identifications. *Id.* at 50-51. However, the court subsequently modified its ruling to permit defense counsel to renew his application at the close of the prosecution's case. *Id.* at 110-11. Defense counsel did not renew the application at this time. *See* Trial Tr. at 1115-40.

### iii.    Exclusion of Testimony of Delon Duncan

At the beginning of its case, the defense offered Delon Duncan, Petitioner's friend, as a witness. Trial Tr. at 1131. Defense counsel stated that Duncan would testify that Petitioner had "frequented" his apartment on Avenue J near Remsen Avenue, which is near where Petitioner had told Detective Arnao that he had been shot. *Id*.

The prosecutor suggested that the defense appeared to be offering Duncan as an alibi witness. *Id.* at 1135-36.[2] Defense counsel said that Duncan was not an alibi witness and acknowledged that Duncan would provide a "reason" as to why Petitioner would have been in the vicinity of Avenue J and Remsen Avenue on the afternoon of May 10, 2006. *Id.* at 1136. The court ruled that Duncan would be allowed to testify. *Id.* at 1136-37.

Delon Duncan took the stand and testified that he had invited Petitioner to his house, located on Avenue J near Remsen Avenue in Canarsie, on May 10, 2006. Duncan: 1258-61. The prosecutor objected to Duncan's testimony outside the presence of the jury. *Id.* at 1261. The court

---

[2] Under New York law, the prosecution may serve a demand upon the defendant to provide a list of intended alibi witnesses, at which point the defendant has eight days to provide notice of such witnesses to the prosecution and to the court. *See* N.Y. Crim. Proc. Law § 250.20. Petitioner's trial counsel did not argue that the prosecution did not serve such a demand. Trial Tr. at 1261-65. Nor does Petitioner here. *See* Habeas Mem.

expressed concern that Duncan was becoming an alibi witness. *Id.* at 1261. Defense counsel stated that Duncan was not an alibi witness because Duncan was never with Petitioner on May 10, 2006. *Id.* at 1261-62. Defense counsel explained that Duncan and Petitioner had arranged to meet that day at Duncan's house, but Duncan was late and missed the meeting. *Id.* Defense counsel also proffered that Duncan would testify that another reason Petitioner wanted to go to Duncan's house was because Petitioner had personal property there. *Id.* at 1262. Defense counsel stated that this testimony would be relevant to rebut Detective Arnao's testimony that he did not believe that Petitioner was anywhere near Canarsie on May 10, 2006. *Id.* The court corrected defense counsel and stated that Detective Arnao had testified that he did not believe that Petitioner had been shot in Canarsie. *Id.* at 1263. The prosecution again objected that Duncan was an unnoticed alibi witness. *Id.* The court ruled that Duncan's proffered testimony was "absolutely irrelevant," and instructed the jury to disregard it. *Id.* at 1265.

- *Verdict and State Appellate/Collateral Review*

Petitioner's application to overturn his conviction in his appeal to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), was denied on April 24, 2012. *See Grant*, 942 N.Y.S.2d 223, *leave to appeal denied*, *People v. Grant*, 25 N.Y.3d 1201 (2015). Petitioner's application for a writ of error coram nobis based on ineffective assistance of appellate counsel was denied on October 11, 2017. *People v. Grant*, 61 N.Y.S.3d 503 (2d Dep't 2017), *leave to appeal denied*, *People v. Grant*, 30 N.Y.3d 1105 (2018). Respondent does not argue that Petitioner has failed to exhaust his state remedies. *See* Response to Oder to Show Cause ("Response"), ECF No. 8; *see also Day v. McDonough*, 547 U.S. 198, 206 (2006) (noting that, generally, failure to exhaust remedies is an affirmative defense to the adjudication of a petition for habeas corpus). This Court may therefore rule on the instant petition.

**DISCUSSION**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the District Court's standard of review of this petition for habeas corpus. Under that statute, when a petitioner seeks a writ of habeas corpus vacating a conviction for errors of law, he must show that the merits of his claim were adjudicated in state court and that the adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to "clearly established federal law as determined by the Supreme Court if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 405-06. If the decision is not contrary to Supreme Court precedent, then the much more deferential "unreasonable application" test applies, and under that standard a petitioner may not receive "federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Chrysler v. Guiney*, 806 F.3d 104, 118 (2d Cir. 2015) (quoting *Harrington*, 562 U.S. at 101).

For the reasons discussed below, the Court finds that none of the issues raised in the instant petition for habeas corpus state a claim for the writ and should be denied.

**I.    Swann's In-Court Identification**

Petitioner argues that Swann's in-court identification was so unreliable that it violated his right to due process under the Fourteenth Amendment, and that the Appellate Division's decision upholding its admission was an unreasonable application of clearly established Supreme Court precedent. *See* Memorandum in Support of Petition for Habeas Corpus ("Habeas Memo"), ECF

No. 1-2 at 30-34. Respondent disagrees. Response at 11-15.[3] Although Swann's identification was arguably suspect, the Appellate Division's decision to affirm the admission of the testimony was not an unreasonable application of Supreme Court precedent.

    *i.*      *Unreasonable Application*

The relevant decisions at issue here are *Neil v. Biggers*, 409 U.S. 188 (1972) and *Manson v. Brathwaite*, 432 U.S. 98 (1977), two cases that held that due process requires the exclusion of identifications engendering a "very substantial likelihood of irreparable misidentification," 432 U.S. at 98, and set forth factors to be considered in evaluating the likelihood of misidentification: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation," 409 U.S. at 199-200.

Under these factors, it appears that the in-court identification may have been so unreliable that it created a substantial risk of misidentification. The prosecutor did not simply ask Swann if he saw the perpetrator in the courtroom. Instead, the prosecutor primed Swann to identify Petitioner by first asking whether anyone had the "same skin complexion as . . . the person you described as light skinned or dark skinned? Start with the light-skinned person, anyone with that same complexion?" Trial Tr. at 384:18-21. Swann then identified Petitioner as someone whose

---

[3] There is no question here that the law was clearly established, because the Second Circuit has previously found that clearly established Supreme Court precedent mandates that "identification testimony must not lead to the likelihood of irreparable misidentification as a result of impermissibly suggestive procedures." *Kennaugh v. Miller*, 289 F.3d 36, 44 (2d Cir. 2002). However, because the Supreme Court has not specifically held that *in-court* identifications are subject to the same scrutiny as pre-trial identifications, the appropriate standard here is the "unreasonable application" test. *Id.* ("[S]ince *Biggers* and *Manson* did not involve facts that are materially indistinguishable from those in the instant case, the state court's decision cannot be deemed contrary to clearly established federal law as defined by the Supreme Court.").

skin complexion matched that of the light-skinned perpetrator. *Id*. at 384:22-385:8. Only then did the prosecutor elicit the identification. *Id*. at 385:9-10 ("Q Do you recognize that individual there? A He looks like him, yeah."). After that line of questioning, it is completely unsurprising that Swann then picked out the sole defendant and sole black man sitting at the defense table "in conditions reeking of criminality." *United States v. Emanuele*, 51 F.3d 1123, 1131 (3d Cir. 1995).

This is not to say that all suggestive, in-court identifications are constitutionally unreliable; even "an identification at trial under circumstances that are tantamount to a show-up is not per se inadmissible, but rather depends upon the totality of the circumstances." *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994) (internal quotation marks and citation omitted). The key difference between a reliable and unreliable in-court identification is whether the identification had "an origin independent of . . . [the] viewing . . . in the courtroom." *Id*. at 548.

The problem here is that the independent basis of Swann's identification is practically non-existent. There was simply no reason for anyone to believe that Swann was capable of reliably identifying the perpetrator when Swann sat down in the witness stand. Swann's opportunity to view the perpetrator at the time of the crime is itself suspect by his own admission. *See* Swann: 380, 382 (admitting that he could only see "the side" of the light-skinned perpetrator "from his back"). And at the line-up he identified two different people as the light-skinned perpetrator, *see* Swann: 387-89, 436-37, 441, 448, suggesting that the opportunity was indeed too slight to support a reliable identification. Swann's statement, "[h]e looks like him, yeah," Swann: 385:10, is an admitted lack of certainty that "renders manifest the impact of . . . viewing defendant" under such suggestive conditions. *Emanuele*, 51 F.3d at 1131. Finally, Swann's in-court identification, on December 3, 2007, was made nearly 19 months after the crime occurred on May 10, 2006. Trial

Tr. at 287; Swann: 370. This length of time clearly weighs against the reliability of Swann's identification.

Thus, it appears that "the viewing communicated to the witness that the defendant was the robber, and there was no reliable evidence that [he] would have so concluded or testified absent that viewing." *Emanuele*, 51 F.3d at 1131. In this Court's opinion, a weighing of the *Biggers* factors indeed seems to suggest an unconstitutionally unreliable identification. *See id.* (finding in-court identification to be unduly suggestive because witness had earlier failed to identify the defendant in a photo line-up and that "failure, coupled with the highly suggestive viewing of the defendant in conditions reeking of criminality . . . render the in-court identification unreliable"); *see also Kennaugh v. Miller*, 289 F.3d 36, 46 (2d Cir. 2002) ("The fact that she had participated in a line-up as well as several photo arrays and was unable to identify the petitioner during any of these repeated pretrial confrontations, inevitably heightens the risk that her in-court identification was induced by the suggestiveness of the setting in which it occurred."); *McFowler v. Jaimet*, 349 F.3d 436, 453-54 (7th Cir. 2003) ("Nothing in the record explains why at the line-up, on the very day of the offense, Meredith could have picked two people as the one person she saw holding the shotgun and then two years later picked McFowler alone. Nothing, that is, except the inherently suggestive environs of the courtroom.").

This Court, however, does "not sit in direct review," of the Appellate Division's decision. *McFowler*, 349 F.3d at 455. Rather, "AEDPA demands . . . appropriate deference to the decisionmaking authority of the state courts," *id.*, and the Court cannot grant the petitioner federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Chrysler*, 806 F.3d at 118. Where, as in this case, the state court does not provide reasons for its decision, we examine "what arguments or theories . . . *could* have supported" that decision,

and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102 (emphasis added). Compounding the deference afforded to the Appellate Division's determination are the instructions of the Supreme Court in *Yarborough v. Alvarado*, 541 U.S. 652 (2004) regarding the application of Supreme Court precedent that is general in nature on habeas review:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Id.* at 664. In light of the deference demanded by these standards, the Appellate Division's decision to uphold the admission of Swann's in-court identification must stand as an objectively reasonable application of Supreme Court precedent.

The decision passes this deferential standard because fairminded jurists have disagreed over similar identifications. It is, after all, "not unheard of for an eyewitness to fail to identify the defendant in a line-up, to pick the wrong person, or to express some ambivalence about her identification, only to later make a positive identification." *McFowler*, 349 F.3d at 453. In such cases, some courts have excused the earlier failure to identify the defendant so long as "the apparent inconsistency is explained by such things as the witness's emotional state, her failure to view the line-up with sufficient care, or an unexpected change in the defendant's appearance between the time of the crime and the line-up." *Id.*

Here, Swann did have such an explanation that could have been acceptable to other fairminded jurists. On re-direct, Swann said that he could not get a good look at the members of

the line-up because "they wasn't standing up, they had their hats on." Swann: 390:1-3.

Explanations such as this have been sufficient for several other courts to admit or affirm the

admission of subsequent in-court identifications. *See*, *e.g.*, *Howard v. Bouchard*, 405 F.3d 459,

484 (6th Cir. 2005) (excusing earlier failure to identify defendant in a photo array and affirming

the admission of in-court identification because "[t]o our eyes, the picture of suspect No. 4 is very

similar to Howard's picture"); *United States v. Morgan*, 248 F. Supp. 3d 208, 214-15 (D.D.C.

2017) (allowing for admission of in-court identification despite earlier failure to identify in a photo

array because "the photo was blurry"); *see also McFowler*, 349 F.3d at 453 (collecting cases). It

was, therefore, particularly in light of the general nature of the *Biggers* standard, "*not* unreasonable

to infer, as the state court did, that [the] failure to identify the petitioner earlier went to the weight

to be accorded to her testimony, not to its admissibility." *Jones v. Pepe*, No. 07-CV-10032 (DPW),

2011 WL 2971956, at *7 (D. Mass. July 20, 2011) (internal quotation marks and citation omitted)

(emphasis in original).

Thus, because Swann's in-court identification of Petitioner was not so profoundly

unreliable that no fairminded jurist could have agreed with the Appellate Division's decision,

Petitioner's request for a writ of habeas corpus on that ground should be denied.

*ii.     Harmless Error*

Even if the Court were to find that no fairminded jurist could have upheld the admission

of Swann's in-court identification of Petitioner, that error was harmless. *See Wray v. Johnson*, 202

F.3d 515, 525 (2d Cir. 2000) ("[T]he erroneous admission of unreliable identification testimony

does not warrant relief from the conviction if the error was harmless.").

The applicable harmless error standard on habeas review of a state court conviction is

whether the error had a "substantial and injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), *overruling in part Chapman v. California*, 386 U.S. 18 (1967). In assessing whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, "the principal factors to be considered are the importance of the witness's wrongly admitted testimony and the overall strength of the prosecution's case." *Wray*, 202 F.3d at 526. The strength of the prosecution's case "is probably the single most critical factor in determining whether error was harmless." *Id.* In determining the importance of wrongly admitted testimony, courts consider whether the testimony "bore on an issue that is plainly critical to the jury's decision; whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative; and whether the wrongly admitted evidence was emphasized in arguments to the jury." *Id.* (internal quotation marks and citations omitted).

Consideration of these factors leads the Court to conclude that any error in the admission of Swann's in-court identification of Petitioner was harmless. Overall, the evidence of Petitioner's guilt was overwhelming. The main witness for the prosecution was Detective Young, an off-duty cop. Detective Young was a long-time resident of the neighborhood where the shooting took place. Detective Young observed Petitioner with an unobstructed view, in daylight, for five to fifteen minutes before the shooting. Detective Young unequivocally identified Petitioner as the shooter at the nearby hospital fifteen minutes after the shooting, and again in court.

Detective Young's identification was supported by the testimony of several other witnesses and by physical evidence. The prosecution presented several eyewitnesses, including Detective Young, Detective Young's acquaintances, and residents in the area, all of whom presented testimony consistent with an identification of the car as a burgundy Nissan Maxima with out-of-state license plates, luxury rims, and tinted windows. It was stipulated that Petitioner's mother

owned this car. The police had previously pulled over Petitioner while he drove the car. After the shooting, the car was found at the shared address of Petitioner and his mother. Eyewitness Frances Waldrop testified that the perpetrator who had been wounded entered the front passenger seat of the car. The police found blood stains on the front passenger seat of the car. DNA testing confirmed that the blood in the car was Petitioner's blood.

Petitioner walked into Kings County Hospital approximately fifteen minutes after the shooting. At the hospital, Petitioner gave false and evasive answers to Detective Arnao as to how and where he was shot. First, Petitioner told Detective Arnao that he was in Canarsie when a man in a blue bandana fired one shot that hit petitioner in the leg. However, there were bullet holes from multiple gunshots from Petitioner's clothing, including in his shirt. Petitioner told Detective Arnao that he was in Canarsie to visit a friend named Richie, but Petitioner did not know Richie's last name or address. At trial, Petitioner attempted to present testimony that he had been in Canarsie to meet Delon Duncan (nickname "Dun"), not Richie. Petitioner also told Detective Arnao that if he went to a certain location in Canarsie, he would find a shell casing. But Petitioner could not describe the gun to Detective Arnao, even though he claimed to have been close enough to the gunman to have seen the casing discharged from the gun. The police investigated Petitioner's claim that he had been shot near Avenue J and Remsen Avenue in Canarsie, but found no such shell casing and could otherwise not substantiate the claim.

As to the importance of the challenged testimony, Swann's in-court identification of Petitioner obviously related to a critical issue in the case. But, as explained above, this testimony was directly cumulative of Detective Young's identification, and Petitioner's identity as the perpetrator was supported by overwhelming corroborating evidence. Moreover, the prosecution did not rely on Swann's in-court identification in its summation. Trial Tr. at 1337-83. In fact, the

prosecution only brought up Swann's testimony by referencing his *failure* to identify Petitioner at the line-up, attempting to rebut the defense's theory that the police had framed Petitioner. *Id.* at 1367-68.

Petitioner argues that the Second Circuit's decision in *Kampshoff v. Smith*, 698 F.2d 581 (2d Cir. 1983) should control the outcome here because the court "found that the improper admission of identification testimony was not harmless despite its being merely corroborative of an accomplice's testimony." Reply, ECF No. 10 at 4. But that case predates the Supreme Court's decision in *Brecht*, which replaced *Chapman*'s "harmless beyond a reasonable doubt" standard, 386 U.S. at 24, with the much more probing "substantial and injurious effect or influence in determining the jury's verdict" standard, 507 U.S. at 623. And unlike in *Kampshoff*, the evidence supporting the verdict here does not merely include one other eyewitness, but overwhelming physical and circumstantial evidence. As detailed above, the analysis currently applied by courts in the Second Circuit, *see Wray*, 202 F.3d 515, supports a finding that even if no fair-minded jurist could agree with the Appellate Division's decision, the admission of Swann's identification was harmless error.

## II.    Exclusion of Defense Testimony

Petitioner argues that he was deprived of constitutional rights to due process and a fundamentally fair trial because the trial court excluded: (1) expert witness testimony regarding the unreliability of eyewitness testimony; and (2) the testimony of Delon Duncan regarding Petitioner's reason for being in Canarsie at the time of the robbery. *See* Habeas Memo at 34-48.

### i.    *Expert Testimony on Eyewitness Identifications*

As noted, defense counsel made a pre-trial application to introduce the testimony of an expert on the reliability of eyewitness identifications. The trial court denied the defense's

application without prejudice, granting leave to renew the application at the close of the prosecution's case-in-chief. The defense never renewed this application, nor did the defense at any point object to the court's denial of the application in constitutional terms.

       o   *Adequate and Independent State Ground*

A federal court may entertain a petition for a writ of habeas corpus on behalf of a state prisoner only on the ground that the prisoner is being held in custody in violation of the United States Constitution, federal law, or United States treaties. 28 U.S.C. § 2254(a). The adequate and independent state ground doctrine bars claims by state prisoners in federal habeas actions when the state court declined to the address the prisoner's federal claims because the prisoner failed to meet a state procedural requirement. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Review by the federal court is barred if the last state court rendering a judgment in the case clearly and expressly stated that its judgment rested on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

Petitioner argued clearly before the Appellate Division that the exclusion of the eyewitness expert denied him the constitutional right to present a defense and to due process. Appellant's Brief, ECF No. 8-19 at 63-69. The Appellate Division, in its opinion, discussed the merits of many of Petitioner's appellate claims, but not this claim. *See Grant*, 942 N.Y.S.2d at 223. With respect to the unaddressed claims, the Appellate Division wrote: "The defendant's remaining contentions are unpreserved for appellate review and, in any event, without merit." *Id.* By process of elimination, this residual clause in the Appellate Division's opinion includes Petitioner's claim that the trial court's exclusion of eyewitness expert testimony violated his constitutional rights. This residual clause constitutes a clear and express statement that the Appellate Division's determination of the claim rested on a state procedural bar. *See Green v. Travis*, 414 F.3d 288, 294

(2d Cir. 2005) (claim procedurally defaulted where state court says that claim is "not preserved for appellate review" but then rules "in any event" on the merits); *Andrews v. LeClaire*, 709 F. Supp. 2d 269, 277 (S.D.N.Y. 2010) (where Appellate Division's decision addressed each of petitioner's claims but one, and then at the end of the decision stated that defendant's remaining contention is unpreserved for appellate review, by process of elimination it must be concluded that the Appellate Division found the unaddressed claim unpreserved and dismissed it due to this procedural default); *Liggins v. Burge*, 689 F. Supp. 2d 640, 651-53 (S.D.N.Y. 2010) (same).

The state argued before the Appellate Division that Petitioner had not preserved a constitutional claim regarding the trial court's exclusion of expert testimony on eyewitness identifications. State's Appellate Brief, ECF No. 8-20 at 57-58. The state also argued that Petitioner had not preserved a state law evidentiary claim on this issue because defense counsel had abandoned the claim by failing to renew his application to present the testimony at the close of the prosecution's case. *Id.* at 62-63. The state's vigorous opposition to a petitioner's claim in state court as unpreserved for appellate review is a principal factor in a habeas court's evaluation of the basis for an appellate court's decision. *Copeland v. Walker*, 258 F. Supp. 2d 105, 129 (E.D.N.Y. 2003) (Korman, J.) (citing *Gruttola v. Hammock*, 639 F.2d 922, 929 (2d Cir. 1981)).

New York's contemporaneous objection rule, Criminal Procedure Law § 470.05(2), requires that the objecting party make his position known to the trial court. Thus, under New York law, in order to preserve a constitutional claim for appellate review, the party must present the claim to the trial court in constitutional terms. *See, e.g.*, *People v. Kello*, 96 N.Y.2d 740, 744 (2001). This state procedural rule is firmly established and regularly followed with respect to the claim that the defendant has been denied the constitutional right to present a defense. *See People v. Lane*, 7 N.Y.3d 888, 889 (N.Y. 2006) (constitutional claim of right to present a defense

unpreserved where not raised in the trial court); *accord People v. Jones*, 110 A.D.3d 493, 494 (1st Dep't 2013); *People v. Simmons*, 106 A.D.3d 1115, 1116 (2d Dep't 2013); *People v. Castor*, 99 A.D.3d 1177, 1181 (4th Dep't 2012); *People v. Sims*, 57 A.D.3d 1106, 1109 (3d Dep't 2008). The Second Circuit has held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule. *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011). Furthermore, district courts in the circuit have applied the adequate and independent state ground doctrine to bar right-to-present-a-defense claims because the petitioner failed to raise the claim in constitutional terms before the trial court. *See Valdez-Cruz v. Racette*, 13-CV-03033 (JFB), 2014 WL 3795577, at *6-7 (E.D.N.Y. Aug. 1, 2014); *Schafer v. LaVallee*, 12-CV-00419 (MAT), 2013 WL 5272963, at *7 (W.D.N.Y. Sept. 17, 2013).

Also firmly established and regularly followed in New York is the rule that counsel abandons an application by failing to renew it when the trial court denies the application without prejudice to renew. *See People v. Russell*, 71 N.Y.2d 1016, 1017-18 (1988); *People v. Carrasquillo*, 85 A.D.3d 1618, 1619 (4th Dep't 2011); *People v. Forte*, 70 A.D.3d 963, 964 (2d Dep't 2010); *People v. Richardson*, 28 A.D.3d 1002, 1003 (3d Dep't 2006); *People v. Ortiz*, 165 A.D.2d 675, 675-76 (1st Dep't 1990). This, too, constitutes an adequate and independent state ground barring habeas review of petitioner's claim. *See Prendergast v. Rivera*, 06–CV-5314 (BMC), 2011 WL 4899945, at *3-4 (E.D.N.Y. Oct. 13, 2011) (New York's abandonment rule constitutes adequate and independent state ground); *Bailey v. Ercole*, 06–CV-5811 (PKC) (MHD), 2007 WL 4707738, at *8 (S.D.N.Y. Aug. 17, 2007) (same).

Both because Petitioner failed to renew his application to introduce the eyewitness expert testimony after the judge denied the application without prejudice and because Petitioner never

voiced an objection to the judge's decision in constitutional terms, this Court cannot disturb the adequate and independent state ground of procedural default found by the Appellate Division.

    *ii.*    *Testimony of Delon Duncan*

Petitioner also requests that this Court review the decision of the Appellate Division upholding the trial court's exclusion of defense witness Delon Duncan for constitutional error. According to Petitioner, Delon Duncan would have testified that he and Petitioner had intended to meet at Duncan's home at the time of the shooting. However, the defense argued at trial that Duncan would not serve as an alibi witness, as the time period to notice alibi witnesses had lapsed by the time the defense applied to introduce his testimony. The trial court found that Duncan's testimony was "absolutely irrelevant" and precluded the defense from calling him. The Appellate Division decided that the trial court's decision to preclude Duncan's testimony was not an abuse of discretion under the New York Rules of Evidence. *Grant*, 942 N.Y.S.2d at 229 ("The Supreme Court did not improvidently exercise its discretion in excluding, as irrelevant, the testimony of the defendant's friend….") (citing *People v. Scarola*, 530 N.Y.S.2d 83 (N.Y. 1988)).

    • *Petitioner's Constitutional Claim Is Unpreserved*

Respondent argues that the Appellate Division also adjudicated and dismissed Petitioner's constitutional claims regarding the exclusion of Duncan's testimony by virtue of its residual clause, finding them "unpreserved for appellate review and, in any event, without merit." Response at 31-34. Respondent suggests that "Petitioner did not preserve the constitutional claim because [P]etitioner did not present the claim to the trial court in constitutional terms." *Id.* at 33. Respondent argues that because the Appellate Division explicitly upheld the exclusion on evidentiary grounds, by process of elimination it deemed the constitutional claims unpreserved. *Id.* at 31-32. Respondent notes that the state argued in its brief to the Appellate Division that the

constitutional claim regarding the exclusion of Duncan's testimony was unpreserved, which is a factor in evaluating the basis for a state appellate court's decision on habeas review. *Id.* at 32 (citing *Copeland*, 258 F. Supp. 2d at 129).

The Court agrees with Respondent. The Appellate Division expressly and clearly limited its decision regarding the exclusion of Duncan's testimony to state law evidentiary grounds, upholding the trial court's finding that the testimony was "irrelevant." *Grant*, 942 N.Y.S.2d at 223. In reaching this holding, the Appellate Division cited *People v. Scarola*, a case in which the Court of Appeals of New York discussed only whether the trial court's decision to exclude evidence was an improvident exercise of discretion, not whether it violated the federal (or state) constitution. *See* 530 N.Y.S.2d at 83-88. Moreover, Petitioner's appellate brief does not provide evidence, or even *allege* other than in a heading, that defense counsel preserved this constitutional claim at trial. *Compare* Appellant's Brief at 60 (heading alleging constitutional violation), *with id.* at 71 ("Defense counsel preserved his evidentiary claims with his requests to elicit testimony and offers of proof. *Were his constitutional claims deemed unpreserved*, they would merit interest of justice review. Alternatively, to the extent counsel failed to preserve the constitutional claims, they denied appellant the effective assistance of counsel.") (emphasis added).[4] The Appellate Division's decision, especially viewed in light of Petitioner's weak assertion of this claim on appeal and the state's direct argument that this claim was unpreserved, clearly and expressly found that Petitioner failed to preserve this objection on constitutional grounds for review, and this represents an adequate and independent state ground that precludes habeas review.

---

[4] Petitioner's habeas brief, likewise, does not point to any evidence suggesting that Petitioner raised this claim in constitutional terms, and does not allege so other than arguably in the brief's headings. *Compare* Habeas Memo at 35 ("The Issues Were Preserved and Exhausted."), *with id.* at 38 (arguing that "[p]lainly, the issue of the relevance and admissibility of Duncan's testimony was preserved," but not mentioning preservation of the constitutional claims).

- *The Trial Court's Evidentiary Ruling Was Correct Regardless*

Even if Petitioner's claims that the exclusion of Duncan's testimony deprived him of due process and the right to present a defense had been preserved, these claims would be without merit. In the opinion of this Court, the trial court correctly held that, because Duncan was not being offered as an alibi witness, the defense did not proffer any relevant testimony that he could provide.[5]

In this habeas action, Petitioner maintains defense counsel's position that Duncan's proposed testimony "did not provide an alibi for Mr. Grant, but [] provided some support for Mr. Grant's statement to police that he was in that area at the time of the shooting, and a counter to the opinions of Detectives Arnao and Duque [sic]."[6] Habeas Memo at 46.

If Duncan were to testify as to an alibi on behalf of Petitioner, his testimony would have been plainly relevant. But because Petitioner vigorously maintained at trial (and maintains here) that he would *not* offer an alibi, the Court is unable to see what relevant testimony he could offer. Trial counsel argued that Duncan's testimony would show that Petitioner "frequented" Duncan's house, Trial Tr. at 1131, and that he had "reasons" to visit Duncan's house on the afternoon of the shooting, Trial Tr. at 1262. The Court cannot see how the fact that Petitioner frequented a location or that he had "reasons" to be there are relevant to any question presented at the trial, *unless* these statements are somehow intended to suggest that Petitioner was actually there rather than at the scene of the crime. But such a suggestion would clearly be unnoticed, and therefore inadmissible, alibi testimony.

---

[5] *See* Note 2, *supra*, for a discussion of the requirement that criminal defendants provide advance notice of alibi witnesses under the New York criminal procedure laws.

[6] Sergeant Duque testified that he could not substantiate Petitioner's claim that he was shot near Avenue J and Remsen Avenue after an investigation of this area. His testimony thus tends to prove fundamentally the same facts testified to by Detective Arnao.

This paradox also applies to the defense's suggestion that Duncan's testimony would have been relevant to counter the testimony of Detective Arnao, who stated that he did not believe Petitioner's claim that he was shot near Avenue J and Remsen Avenue. If Duncan would have suggested through his testimony that Petitioner was telling the truth about being shot in this location, this could have rebutted Detective Arnao's testimony on a clearly relevant issue. But again, Duncan's testifying to such would make him an alibi witness. If Duncan would not have suggested that Petitioner told Detective Arnao the truth about his location, then he would indeed not be an alibi witness, but there is no indication that he could say anything relevant.

In short, the trial court properly barred defense counsel's attempt to skirt the alibi witness notice requirement by finding that Duncan had no relevant testimony to provide other than alibi testimony.

Because the Court finds that the trial court was correct in its ruling on evidentiary grounds, the Court need not consider whether this ruling amounted to a constitutional violation or whether this ruling could survive AEDPA deference.

### III.    Ineffective Assistance of Counsel

Finally, Petitioner argues that he received ineffective assistance of counsel under the Sixth Amendment insofar as his trial counsel failed to object on constitutional grounds to the exclusion of the testimony of the eyewitness expert and Delon Duncan.

- *Standard*

*Strickland v. Washington*, 466 U.S. 668 (1984) governs Sixth Amendment ineffective assistance of counsel claims. *See Llynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006). To establish a violation of the Sixth Amendment right to effective assistance of counsel under *Strickland*, a habeas petitioner must show (1) that counsel's performance was deficient, i.e., that counsel made

errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense, i.e., that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687.

To show deficient performance, a habeas petitioner must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687-88. "Judicial scrutiny of counsel's performance must be highly deferential" and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. To establish prejudice, a petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

However, a habeas petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, [the petitioner] must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* at 699. "The *Strickland* standard is a general one, so the range of reasonable application is substantial." *Harrington*, 562 U.S. at 105. "Courts on collateral review may not second-guess reasonable professional judgments and impose on counsel a duty to raise every colorable claim suggested by a client." *Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017) (internal quotation marks and citation omitted), *cert. denied*, 138 S. Ct. 1309 (2018). And "the failure to make a meritless argument does not rise to the level of ineffective assistance." *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995).

"Nevertheless, failure to raise an argument may, in some instances, constitute deficient performance. A petitioner may establish constitutionally inadequate performance if he shows that counsel omitted *significant and obvious* issues while pursuing issues that were clearly and significantly weaker. Relief may be warranted when a decision by counsel to forgo an argument cannot be justified as a result of some kind of plausible litigation strategy." *Weingarten*, 865 F.3d at 53 (internal quotation marks, citations, and brackets omitted) (emphasis in original).

- *Application*

First, as discussed, the Court sees no error in the trial court's decision to exclude the testimony of Delon Duncan as irrelevant. The Court could not base a finding of ineffective assistance of counsel, in whole or in part, on trial counsel's failure to preserve the meritless argument that this exclusion constituted the denial of the constitutional right to present a defense. *See Kirsh*, 54 F.3d at 1071.

The Court also finds that the trial court's exclusion of the defense's proposed eyewitness expert was not an abuse of discretion under New York law. Thus, trial counsel was not deficient for not raising an objection to the trial court's ruling in constitutional terms.

A state court's improper evidentiary rulings may violate a defendant's constitutional rights to present a defense and to due process if they are so pervasive as to have deprived him of a fundamentally fair trial. *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d. Cir. 1988). In determining whether the state court's exclusion of evidence was of such constitutional magnitude, courts must determine both "1) whether the exclusion was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial." *Perez v. Phillips*, 210 F. App'x 55, 57 (2d Cir. 2006) (citing *Dey v. Scully*, 952 F. Supp. 957 (E.D.N.Y. 1997)).

The Court of Appeals of New York has held it may be an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime." *People v. LeGrand*, 8 N.Y.3d 449, 452 (2007). In several cases, the Court of Appeals has held that the trial court did not abuse its discretion by excluding such expert testimony, finding that the other corroborating evidence presented was sufficient. *See People v. Allen*, 13 N.Y.3d 251, 269 (2009) (trial court did not abuse its discretion in excluding expert testimony on reliability of eyewitness identifications where robbery victim's identification of defendant was corroborated by second independent identification of person who knew defendant); *People v. Young*, 7 N.Y.3d 40, 44-46 (2006) (trial court did not abuse its discretion in excluding expert testimony on reliability of eyewitness identifications where burglary victim's identification of male defendant was corroborated by fact that two of defendant's female acquaintances were found in possession of property stolen during the burglary and one of the females said she got the property from defendant); *People v. Lee*, 96 N.Y.2d 157, 162-63 (2001) (trial court did not abuse its discretion in excluding expert testimony on reliability of eyewitness identifications where the carjacking victim's identification of defendant was corroborated by fact that defendant was discovered driving the stolen vehicle).

The evidence corroborating Petitioner's identity as the shooter is at least as strong as the evidence in the aforementioned cases. Several witnesses saw the perpetrators pistol-whip and shoot the victim. Several witnesses saw the perpetrators flee the scene in a burgundy Maxima with tinted windows, custom rims, and out-of-state license plates. One witness testified that the perpetrator who had entered the front passenger seat of the Maxima said that he had been shot. Approximately fifteen minutes later, Petitioner walked into a nearby hospital with a bullet wound to his left leg.

The police went to Petitioner's home and found the burgundy Maxima there. Blood was found on the front passenger seat in locations corresponding to Petitioner's leg wound. DNA testing confirmed that Petitioner was the source of the blood. A discharged shell casing found in Petitioner's clothing matched shell casings found at the scene of the crime. And the five bullet holes in Petitioner's shirt belied his claim that he had been hit in the leg by a single shot while walking in Canarsie. In light of this evidence, under New York law, it was within the trial court's discretion to exclude the proposed testimony of the defendant's expert on eyewitness identification.

Having found that the trial court's decision to exclude the expert testimony was valid under New York law, the Court need not consider whether the exclusion amounted to a federal constitutional violation, whether failing to raise a constitutional objection amounted to deficient performance by trial counsel, or whether the Appellate Division's application of *Strickland* would be upheld under AEDPA deference.

## CONCLUSION

Because the Appellate Division's decision upholding the validity of Swann's in-court identification of Petitioner was not an unreasonable application of clearly established federal law as determined by the Supreme Court, the Court recommends finding that no ground for habeas relief arises from this claim. Because the trial court's exclusion of Petitioner's proposed expert testimony regarding eyewitness identification and the testimony of Delon Duncan were not preserved and were both valid under New York law regardless, the Court recommends finding that an adequate and independent state ground deprives the Court's jurisdiction over both claims, and that Petitioner's trial counsel was not ineffective by virtue of his failure to raise these claims in constitutional terms.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Pursuant to Fed. R. Civ. P. 72(b)(2), the Parties shall then have fourteen (14) days from service of any objections to respond. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

> /s/ Steven L. Tiscione
> Steven L. Tiscione
> United States Magistrate Judge
> Eastern District of New York

Dated: Brooklyn, New York
       March 4, 2019